UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MAUREEN WRIGHT-JACKSON,

                          07 Civ. 1819 (DFE)

                 Plaintiff,

                          (This is not an
       - against -           an ECF case.)

HIP HEALTH PLAN,               <u>OPINION AND ORDER</u>

                 Defendant.
------------------------------------x

    DOUGLAS F. EATON, United States Magistrate Judge.

    <u>Pro se</u> plaintiff Maureen Wright-Jackson brings this lawsuit against her former employer HIP Health Plan ("HIP"), which terminated her employment on December 6, 2004. She alleges that HIP discriminated against her on the basis of her race (African-American), color (black), and national origin (Jamaican) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C.A. §2000e*, et seq.* She also alleges disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12101, *et seq.*

    HIP has moved for summary judgment. For the following reasons, I hereby grant HIP's motion.

FACTUAL AND PROCEDURAL BACKGROUND

    On December 8, 2004, Plaintiff filed a verified complaint with the New York State Division of Human Rights ("NYSDHR"), which dismissed it and made a finding of no probable cause on July 31, 2006. (Doc #24, Exhs. 18, 20.) The U.S. Equal Employment Opportunity Commission adopted the findings of the

NYSHDR and issued a Dismissal and Notice of Rights on October 10, 2006.  On January 10, 2007, our Court's Pro Se Office received Plaintiff's Complaint.  On the form at ¶7, she did not check "national origin," but she annexed a copy of her 9/16/04 memo to HIP in which she accused a superior of an "offensive comment about my accent."

On September 25, 2009, after a lengthy discovery period, HIP's attorney Seema A. Misra of the firm of Stroock & Stroock & Lavan, LLP, served and filed HIP's Notice of Motion for Summary Judgment (Doc #21), accompanied by the following:

Doc #22:  HIP's Memorandum of Law;

Doc #23:  Declaration of Plaintiff's supervisor
          June Hutchinson with Exhibits 1-2;

Doc #24:  Declaration of Diane McGuire with Exhibits 1-20;

Doc #25:  Declaration of Seema A. Misra with Exhibits 1-3;

Doc #26:  HIP's Rule 56.1 Statement of Undisputed Facts;

Doc #27:  Notice to Pro Se Litigant Who Opposes a
          Motion for Summary Judgment (This attached copies
          of Rule 56 of the Federal Rules of Civil
          Procedure, and of Local Civil Rule 56.1, and of
          seven unpublished cases cited by HIP).

In opposition to the motion, Plaintiff submitted the following documents (which I docketed belatedly):

Doc #33:  a 17-page document titled "Plaintiff's
          Submission;"

Doc #34:  a 59-page document titled "Plaintiff's Response to
          Defendant's Statement of Undisputed Facts;"

Doc #35:  a 26-page document titled "Plaintiff's Response

-2-

to Diane McGuire['s] Declaration for Summary Judgment;"

Doc #36:   an 11-page document titled "Plaintiff's Response to June Hutchinson's Declaration for Summary Judgment;"

Doc #37:   an Errata Sheet (pp. 308-21) for the 307-page transcript of her 7/10/08 deposition (the transcript is at Doc #25, Exh. 2);

Doc #38:   a bound volume of Plaintiff's Exhibits, numbered 1-57 (with some gaps).

On November 23, 2009, Ms. Misra filed the following:

Doc #30:   HIP's Memorandum of Law in Further Support;

Doc #31:   Reply Declaration of Diane McGuire;

Doc #32:   HIP's Reply Rule 56.1 Statement of Undisputed Facts (This is the one document which sets out each of the 68 Facts listed by HIP in Doc #26, and then sets out each response or non-response by Plaintiff from Doc #34).

Maureen Wright-Jackson was born in 1961 and grew up in the nation of Jamaica.  She was educated there and worked in business and education before she moved to New York in 1995.  On September 9, 2001, she received a B.Tech. degree in Computer Systems from Globe Institute of Technology.  (Doc #38, Pl. Exh. 4.)  On January 15, 2003, she received an M.S. degree in Information Systems from Pace University.  (Doc #38, Pl. Exh. 2.)

She started working at HIP on October 20, 1997.  She was in the Medicare Marketing Department until March 2003, and was in the Government Assisted Programs ("GAP") Department from April 1, 2003 until December 6, 2004.  In Doc #33, at page 8, she states:

-3-

> I was a great asset to HIP, and I was happy
> with my employment until John Kennedy took
> over as Vice President of the [Medicare
> Marketing] Department in November 2000.

Plaintiff complains about a four-year period from November 2000 to December 6, 2004.  However, as I will explain later at Point II, the statute of limitations extends back only to February 12, 2004.  Any events prior to that date may be considered only as background, or potentially on the claim of hostile work environment (discussed at Point III).

Plaintiff complains at length about Mr. Kennedy and Robert Cronin.  But her employment in their Department (the Medicare Marketing Department) ended in March 2003.

FACT 27 (uncontroverted by Plaintiff) states:

> In March 2003, after submitting an
> application and interviewing with Allie
> Hag[e]n, (a white female)[,] Plaintiff was
> transferred to the GAP Department with the
> title Assistant Manager, Contract Compliance.
> McGuire Dec. at ¶10.

(Doc #32, p. 27.)

June Hutchinson's Declaration states:

> 2.  I have been employed by HIP (or
> Emblem Health) for over 17 years.  I began my
> employment with HIP in 1992, and have worked
> in the GAP department since April of 2003.  I
> joined GAP with the title of Manager,
> Contract Compliance.  Effective January 5,
> 2004, I was promoted to become the Assistant
> Director, Contract Compliance in the GAP
> department, a position formerly held by
> Colette Choute.  In our role as Assistant
> Directors, both Ms. Choute and I reported to
> Allie Hagen, the Director of Contract

-4-

Compliance & Operations.  On February 6,
2009, Ms. Hagen left HIP, and I am submitting
this statement to explain some of the actions
jointly t[aken] by Ms. Hagen and myself, in
relation to Plaintiff Maureen Wright-Jackson.

3.  I am currently responsible for day-
to-day supervision of 10 employees in the GAP
department.  When I became the Assistant
Director [on January 5, 2004], I became the
direct supervisor of Ms. Wright-Jackson (who
had been reporting to Ms. Hagen after Ms.
Choute moved to a different department).
Both Ms. Wright-Jackson and I are African-
American females of Caribbean/Jamaican
background.

(Doc #23, ¶¶2-3.)  Accordingly, in Doc #26 HIP lists FACT 38:

In January, 2004, Hag[e]n promoted June
Hutchinson, an African-American female of
Jamaican/Caribbean background, to the position
of Assistant Director, Contract Compliance.
Plaintiff reported to Hutchinson, and
Hutchinson reported to Hagen.  Hutchinson Dec.
at ¶2.

Plaintiff submits no evidence to controvert any aspect of FACT 38

and therefore it is deemed to be true pursuant to Local Civil

Rule 56.1, which cannot be evaded by Plaintiff's Response ("I

disagree with this paragraph.  I cannot agree that Ms. Hutchinson

was promoted January 2004.  I cannot agree that Ms. Hutchinson is

of a Caribbean/Jamaican background.  I was co-supervised by Ms.

Hutchinson and Ms. Hagen.").  (Doc #34, p. 15.)

From January 5, 2004 until she was fired on December 6,

2004, Plaintiff's direct supervisor was Ms. Hutchinson.  Ms.

Hutchinson's Declaration explains in detail why she, and her

superior Allie Hagen, and the head of the GAP Department Larry

-5-

Minard, all decided to fire Plaintiff.  (Doc #23, ¶¶4-9, 11-15.)

Plaintiff concedes that Ms. Hutchinson repeatedly told her that her performance was deficient.  She says that Ms. Hutchinson made unreasonable demands and misguided criticisms.  (Doc #34, pp. 15-27, 40, 42-44, 49-50.)  But she makes no claim that Ms. Hutchinson was motivated by any intent to discriminate against Plaintiff's race, color, or national origin.

FACT 46 (undisputed, see Doc #32, p. 52) states:

> In late April and May 2004, Hutchinson, Hagen and Minard contacted HR about Plaintiff's inability to improve her performance and requested to start the termination process.

Throughout 2004, Diane McGuire was Assistant Director of Employee Relations in the HR Department; her Declaration states:  "In May of 2004, Ms. Hagen and Ms. Hutchinson consulted with me about terminating Mr. Wright-Jackson's employment because of work performance deficiencies.  We agreed that the GAP Department would generate a written, formal warning, creating a probationary period and requiring immediate improvement."  (Doc #24, ¶15.)

Ms. Hutchinson's Declaration, at ¶11, states:  "We issued a formal warning on May 27, 2004, a true and correct copy of which is attached as Exhibit 2.  ....  Immediately upon receiving the formal warning, Ms. Wright-Jackson went out on disability leave. The [GAP] department was not informed of the details of her disability, either at that time or later [until after her

-6-

termination on 12/6/04]."  (Doc #23, ¶11.)  The Formal Warning
(Doc #23, Exh. 2) told Plaintiff:  "Enrollment Statistics Report
....  You must fully document the process and submit both a hard
copy and electronic copy to Ms. Hutchinson no later than May
28th, 2004.  ....  Failure to immediately correct your
unsatisfactory work performance and sustain that correction will
result in further disciplinary action, up to and including
termination of your employment."  (Doc #23, Exh. 2, pp. 1,2,3.)

FACT 52:  "The day she received this formal warning,
Plaintiff went out on leave until November 1, 2004."  Plaintiff
does not controvert this, although her Response says:  "I did not
just go out on leave; I was taken out of the hostile environment
by my mental health and physician health care professionals."
(Doc #32, p. 70; Doc #34, p. 43.)

FACT 53 (uncontroverted by Plaintiff):  "Because Plaintiff
had received the May 27, 2004 formal warning, she was on
probation when she returned on November 1, 2004."

Regarding Plaintiff's 11/1/04 return to work, her supervisor
Ms. Hutchinson states:

> When Ms. Wright-Jackson returned to work
> Ms. Hagen and I did everything we could to
> ease her back into her work responsibilities.
> We ordered a computer for her, and gave her
> access to a computer terminal and available
> workspace, while we determined her permanent
> station.  On November 3, 2004, Ms. Hagen and
> I both met with her, and together created
> specific due dates for projects during
> November.  We told her that she remained on

> probation, and had to timely and accurately
> complete the assignments given to her.  She
> was given a lighter workload than she would
> normally be responsible for, and each due-
> date gave ample time for completion of the
> projects.  I had generated some of these
> reports myself during Ms. Wright-Jackson's
> absence, and in some instances Ms. Wright-
> Jackson took a full day to complete a project
> that I knew from direct experience could be
> completed in two to three hours.

(Hutchinson Decl., Doc #23 at ¶14; see also Doc #25, Exh. 1 at p.

00855 (a calendar for November 2004 listing the "due dates"

referred to in the passage just quoted).)

Ms. McGuire's Declaration (Doc #24) states at ¶20:

> 20.  On December 6, 2004, HIP terminated
> Ms. Wright-Jackson's employment.  Attached
> hereto as Exhibit 16 is a true and correct
> copy of the December 6, 2004 letter informing
> Ms. Wright-Jackson of the terms of the
> termination.  ....

Exhibit 16 to the McGuire Declaration is a memorandum to

Plaintiff from Mr. Minard, Ms. Hagen and Ms. Hutchinson, with the

subject line "Termination of Employment," dated December 6, 2004.

It said, in part:

> You returned to work from an approved
> leave of absence on November 1, 2004 and on
> November 3, 2004 met with June [Hutchison]
> and me [Allie Hagen].  Together we developed
> a calendar that clearly defined the specific
> projects you would be working on beginning
> November 3, 2004 through November 9, 2004.
> The calendar also specified each project due
> date mutually agreed to.  Prior to your leave
> of absence, you were on a [5/27/04] formal
> warning for unsatisfactory work performance.
> You were reminded that the formal warning
> remained in effect upon your return.  Following

-8-

> a formal warning, it is generally HIP's practice
> to provide an employee with a two week period to
> demonstrate correction; an uncorrected performance
> would result in termination of employment.  During
> the meeting on November 3, 2004, I also reiterated
> the reasons for the Formal Warning in May and
> advised it was necessary for you to be able to
> complete projects accurately and on time and that
> you needed to follow the agreed upon calendar.
> However, since you just returned from leave we
> did not hold you as strictly accountable for the
> agreed upon deadlines for the first week of your
> return.

(Doc #24, Exh. 16, p. 1.)  The memorandum then discusses

Plaintiff's work on six specified projects, of which two were

completed late and two were never completed.  The next to last

paragraph said:

> You continue to not follow directions or
> communicate clearly in a timely manner when
> you can not meet established deadlines.  The
> work you have submitted has not been accurate
> or has not been in the form requested.  You
> have failed to correct your unsatisfactory
> work performance and as a result, the
> decision has been made to terminate your
> employment with HIP Health Plan of New York
> effective today, December 6, 2004.

(*Id.,* p. 3.)

<u>LEGAL DISCUSSION</u>

<u>The Standards for Summary Judgment</u>

Summary judgment shall be granted when there is no genuine

issue of material fact and the moving party is entitled to

judgment as a matter of law.  Fed.R.Civ.P. 56(c).

> This form of relief is appropriate when,
> after discovery, the party – - here plaintiff
> – - against whom summary judgment is sought,

-9-

> has not shown that evidence of an essential
> element of [his] case – – one on which [he]
> has the burden of proof – – exists.  See
> *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,
> 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  This
> form of remedy is inappropriate when the
> issue to be resolved is both genuine and
> related to a disputed material fact.  An
> alleged factual dispute regarding immaterial
> or minor facts between the parties will not
> defeat an otherwise properly supported motion
> for summary judgment.  See *Howard v. Gleason
> Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990).

*Powell v. National Board of Medical Examiners*, 364 F.3d 79, 84

(2d Cir. 2004).  As to materiality, the substantive law will

identify which facts are material.  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2508 (1986).

> .... In deciding the [summary judgment]
> motion, the trial court must first resolve
> all ambiguities and draw all inferences in
> favor of the non-moving party, and then
> determine whether a rational jury could find
> for that party.
>
> At the same time, the non-moving party
> must offer such proof as would allow a
> reasonable juror to return a verdict in his
> favor, see *Anderson v. Liberty Lobby, Inc.*,
> 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d
> 202 (1986), and only when that proof is
> slight is summary judgment appropriate, see
> *Dister v. Continental Group, Inc.*, 859 F.2d
> 1108, 1114 (2d Cir. 1988).  The trial court's
> function at this stage is to identify issues
> to be tried, not decide them.

*Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  In

short, "only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the entry

of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S.Ct. 2505, 2508 (1986).

> [T]here is no issue for trial unless there is
> sufficient evidence favoring the nonmoving
> party for a jury to return a verdict for that
> party.  If the evidence [presented by the
> non-moving party] is merely colorable, or not
> significantly probative, summary judgment may
> be granted.

*Anderson*, 106 S.Ct. at 2511 (internal quotation marks and citations omitted).

The Second Circuit has often cautioned that in employment discrimination cases where intent of the employer is a central factual issue, courts should be "chary" in granting summary judgment.  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000), citing *Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 87 (2d Cir. 1996).  See also, *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  "[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law."  *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999).  Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).  "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001.)

Plaintiff is pro se, and she obviously spent many days preparing her voluminous papers, which I must interpret "to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). It is natural to sympathize with a person suffering from depression and from loss of a job. Nonetheless, the law is clear that pro se status does not relieve a litigant from the usual requirements of summary judgment. *Fitzpatrick v. New York Cornell Hosp.*, 2003 WL 102853, *5 (S.D.N.Y. Jan. 9, 2003).

Accordingly, the plaintiff must provide "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pr. 56(e). Our court must grant HIP's motion for summary judgment unless Ms. Wright-Jackson shows that there is a "genuine" dispute for a trial – – *i.e.*, "there is sufficient evidence favoring [her] for a jury to return a verdict for [her]." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). This she has not done.

<u>HIP's Motion for Summary Judgment</u>

In its Memorandum of Law in Further Support (Doc #30), HIP starts with a new point and then repeats the six points previously made in its initial Memorandum (Doc #22):

> Point I.  Plaintiff's Opposition consists entirely of inadmissible assertions that should be disregarded, and the material facts submitted by HIP should be deemed admitted.

Point II.  Plaintiff's claims relating to allegedly discriminatory acts during her time in the [Medicare] Marketing Department are time barred.

Point III.  Plaintiff does not meet the standard to prove a hostile work environment.

Point IV.  Plaintiff[] cannot make a prima facie case of race/national origin discrimination.

Point V.  Plaintiff has not made a prima facie case for failure to accommodate.

Point VI.  HIP has shown a legitimate reason for plaintiff's formal warning and termination that is not pretextual.

Point VII.  Plaintiff's retaliation claim should be dismissed.

For the most part, HIP's arguments are persuasive, and plaintiff's arguments are not.  I will address each point in turn.

### Point I.  Plaintiff's response to HIP's Rule 56.1 statement of undisputed facts.

HIP's motion papers included the Notice to <u>Pro Se</u> Litigants as required by Local Civil Rule 56.2; the Notice explained to Plaintiff what she was required to do to oppose the motion for summary judgment.  Fed.R.Civ.Pr. Rule 56(e)(2) provides:

> ***Opposing Party's Obligation to Respond.***
> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – – by affidavits or as otherwise provided in this rule - – set out specific facts showing a genuine issue for trial.  If the opposing party does not so

respond, summary judgment should, if
appropriate, be entered against that party.

The Local Civil Rule 56.2 Notice reiterated the substance of Rule

56(e) and explained to Plaintiff:

> [Y]ou must submit evidence, such as witness
> statements or documents, countering the facts
> asserted by the defendant and raising
> material issues of fact for trial.  Any
> witness statement must be in the form of
> affidavits.  You may submit your own
> affidavit and/or the affidavits of others.
> ....
>
>      If you do not respond to the motion for
> summary judgment on time with affidavits or
> documentary evidence contradicting the
> material facts asserted by the defendants,
> the court may accept defendant's factual
> assertions as true.  Judgment may then be
> entered in defendant's favor without a trial.

The Notice also directed Plaintiff's attention to Local Civil

Rule 56.1 (and attached a copy of that Rule).  Subdivision (d)

of that Rule instructs:

>      (d) Each statement by the movant or
> opponent pursuant to Rule 56.1(a) and (b),
> including each statement controverting any
> statement of material fact, must be followed
> by citation to evidence which would be
> admissible, set forth as required by Federal
> Rule of Civil Procedure 56(e).

In almost all respects, Plaintiff has failed to comply with those

instructions.

     HIP's 56.1 Statement (Doc #26) was 12 pages long, and

contained 68 numbered paragraphs.  Each paragraph set forth a

material fact, followed by a citation to a document or an

-14-

affidavit that tends to prove that the asserted fact is true.
Plaintiff's Response (Doc #34) is 59 pages long.  I am willing to
overlook that she does not specifically say that she is declaring
these statements under penalty of perjury.  But I cannot overlook
that her Response consists mostly of her conclusory and
argumentative assertions, and it often fails to give citations to
admissible evidence (documents or affidavits that tend to prove
that an asserted fact is true).

As was her right, she made no response or opposition to 20
of HIP's paragraphs. [1]  As to the remaining 48 paragraphs, she
did at least stay in numerical order.  As to 41 of those
paragraphs, [2] she made some response but did not adequately
controvert them.  She raised a genuine factual issue as to only 7
paragraphs. [3]

Among the 41 paragraphs in the middle category, two of them
concern HIP's FACTS 35 and 36.  HIP's FACT 35 said: "In July
2003, [Colette] Choute issued a Midpoint Probation Evaluation.
This evaluation identified several issues, including that
Plaintiff had to pay more attention to detail when completing
assigned projects, [and that] Plaintiff often repeated the same

---

[1] Paragraphs 1, 2, 4, 5, 7-9, 12-14, 19, 26, 28, 33, 37, 46, 53, 55, 58, 68.

[2] Paragraphs 3, 6, 10-11, 15-18, 20-25, 27, 29-32, 34-36, 38, 39, 41, 42, 45, 47-48, 50-52, 54, 56, 57, 59, 62-65, 67.

[3] Paragraphs 40, 43, 44, 49, 60-61, 66.

-15-

mistakes when asked to correct work, .... McGuire Dec, Ex. 8."
(Doc #26, ¶35.)  Exhibit 8 was produced in discovery as page
0000097; it contains the exact criticisms set forth in FACT 35,
and it shows the 7/8/03 signatures of Plaintiff and of her then
supervisor Colette Choute.  Nevertheless, Plaintiff's Response to
FACT 35 says:

> This document is in question.  I ask the
> court[']s permission for a view [of] the
> original signed copy of this document.  There
> was a portion that mentions errors that was
> insisted to be included by Ms. Hagen, but not
> all these other statements.  Anyway, these
> errors were inherited from Pamela Hinds['s]
> incorrect file that was used to generate the
> initial reports.  Despite the fact, Ms. Hagen
> insisted that these errors appear on my
> review.  ....

(Doc #34, p. 14.)

The next evaluation is in evidence as Exh. 9 to the McGuire
Declaration.  (Doc #24, Exh. 9, consisting of pages 0000002
through 0000009.)  Pages 0000006 and 0000007 contain even more
serious criticisms of Plaintiff; the front page (0000002) shows
that Ms. Choute signed on 12/11/03 as Manager, and Ms. Hagen
signed on 12/11/03 as Director, and Plaintiff signed on 12/12/03
as Employee.  HIP's FACT 36 cited this document and fairly
summarized it.  Plaintiff now responds with an unsubstantiated
and unlikely assertion:  "Neither Ms. Choute nor I saw the
evaluation content [pages 0000003 through 0000009].  All we saw
was the front sheet [page 0000002, when we signed it].  It was

after I sign[ed] ... that Ms. Hagen printed out the evaluation [pages 0000003 through 0000009] from her computer and gave it to me."  (Doc #32, p. 33.)

Plaintiff's attempts to controvert FACTS 35 and 36 would not help her case in any way.  Any rational jury would conclude from these documents and Plaintiff's responses that Plaintiff's performance was criticized by her 2003 supervisor Ms. Choute, even though Plaintiff makes no claim that Ms. Choute was motivated to discriminate against Plaintiff's race, color, or national origin, and even though Plaintiff makes no claim that she was disabled in 2003.

FACTS 35 and 36 pre-date February 12, 2004; as will be discussed in Point II, they may be considered only as background, or potentially on the claim of hostile work environment (discussed at Point III).

<u>Point II.  The 300-day statute of limitations</u>.

Title VII and the ADA have the same threshold requirement: the employee must initially file a "charge of discrimination" with either the EEOC or an equivalent local agency (such as the NYSDHR).  The statute of limitations reaches back from the date when the plaintiff filed the administrative charge.  Plaintiff filed her administrative charge with the NYSDHR on December 8, 2004.  In some states the statute of limitations is 180 days; in New York it is 300 days, which means that Plaintiff's lawsuit can

reach back to conduct that occurred on or after February 12, 2004.

   *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061 (2002), said in its first paragraph:  "We consider whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside this statutory period."  536 U.S. at 105.  Several circuits, including the Second Circuit, had created a "continuing violation" exception to the 300-day rule.  The *Morgan* decision narrowed that exception.  The unanimous portion of the opinion reversed the Ninth Circuit and said:

>            ....  First, discriminatory acts are not
>       actionable if time barred, even when they are
>       related to acts alleged in timely filed
>       charges.  Each discrete discriminatory act
>       starts a new clock for filing charges
>       alleging that act.  The charge, therefore,
>       must be filed within the 180- or 300-day time
>       period after the discrete discriminatory act
>       occurred.
>
>            *         *         *
>
>            Discrete acts such as termination,
>       failure to promote, denial of transfer, or
>       refusal to hire are easy to identify.  Each
>       incident of discrimination and each
>       retaliatory adverse employment decision
>       constitutes a separate actionable "unlawful
>       employment practice."

536 U.S. at 113-14, 122 S.Ct. at 2072-73.

   On the other hand, Part II-B of the *Morgan* opinion (by a vote of 5-4) did allow one exception, limited to claims of

hostile work environment.  The majority wrote that, when such a claim is presented:

> .... A court's task is to determine whether the acts about which an employee complains are **part** of the **same** actionable hostile work environment practice, and if so, whether any act falls within the statutory [300 day] time period.
>
> With respect to Morgan's hostile environment claim, the Court of Appeals concluded that "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated **by the same managers**." ....  On this point, we affirm.

536 U.S. at 120-21, 122 S.Ct. at 2076 (emphasis added).

Ms. Wright-Jackson's Submission (Doc #33, p. 15) cites page 120 of *Morgan* and paraphrases the words I have quoted above.  At page 16, she argues that, on her hostile work environment claim, I ought to determine that Mr. Kennedy's acts were part of the same practice as Ms. Hagen's acts.  I disagree.  Those two managers were in different Departments.  Plaintiff transferred to a different work environment when she transferred to Ms. Hagen's Department on April 1, 2003, long before the 2/12/04 cutoff posed by the 300-day rule.  Plaintiff alleges that Mr. Kennedy and Ms. Hagen were friends, and that Mr. Kennedy visited the GAP Department and, on one such visit in 2003, remarked:  "The only reason Colette Choute likes Maureen [Plaintiff] is because Colette is just like Shirley Atwood."  (Doc #33, p. 9.)  Plaintiff further alleges that the point of the remark was that all three women were black, and that the remark was "suggesting

-19-

that because I was black, I could only get along with and [be]
highly rated by other black employees." (Doc #33, p. 12.) Even
assuming the truth of Plaintiff's allegations, I find that
Plaintiff has failed to show that Mr. Kennedy's acts in the
Medicare Marketing Department were part of the same practice as
Ms. Hagen's acts in the GAP Department. When discussing the
hostile environment claim, I will go back earlier than February
12, 2004, back to April 1, 2003, when Plaintiff began working in
the GAP Department, but I will not consider any acts when she was
working in the Medicare Marketing Department. When discussing
all of the other claims, I will not consider anybody's pre-
2/12/04 acts except as background.

POINT III.  The hostile work environment claim

The Second Circuit has written:

> To survive summary judgment on a claim of
> hostile work environment harassment, a
> plaintiff must produce evidence that "the
> workplace is permeated with discriminatory
> intimidation, ridicule, and insult, that is
> sufficiently severe or pervasive to alter the
> conditions of the victim's employment and
> create an abusive working environment."

*Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)
(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114
S.Ct. 3670 (1993). Plaintiff must show not only that she
subjectively perceived the environment to be abusive, but also
that the environment was objectively hostile and abusive.
*Demoret v. Zegarelli*, 451 F.3d 140 (2d Cir. 2006).

Moreover, a "hostile environment" claim under Title VII requires a showing that the conduct occurred because of plaintiff's membership in a protected class. See *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999). Abusive conduct in the workplace, if not based on a protected class, is not actionable under Title VII. *See Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 81, 118 S.Ct. 998 (1998).

Title VII "does not set forth 'a general civility code for the American workplace,'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006), quoting *Oncale*, 523 U.S. at 8. In *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002), the Second Circuit emphasized this point:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

To analyze a hostile work environment claim, we look to the record as a whole and assess the totality of the circumstances, see *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001). Courts are to consider a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Harris*, 510 U.S. at 23.

Isolated incidents typically do not rise to the level of a hostile work environment. *Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004). Generally, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374. In short, a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Cruz*, 202 F.3d at 570 (citations omitted).

Starting on April 1, 2003, Ms. Wright-Jackson worked in the GAP Department. At pages 12-13 of her Submission, she attempts to show that the GAP Department was a discriminatorily hostile work environment. Her attempt clearly fails to meet the legal requirements, even if we assume that her Submission does not exaggerate the evidence in the record:

> Mr. Kennedy's treatment was so pervasive that I suffered even when I transferred to the GAP department. Mr. Kennedy would go to the GAP department and further ridicule me. He humiliated me in front of other employees by suggesting [in 2003] that because I was black, I could only get along with and [be] highly rated by other black employees. ....
>
> In addition, Ms. Hagen often teased me about her [my] Caribbean accent. On one occasion she taunted me about my pronunciation of another co-worker's name. This taunting was so offensive that another

> coworker, Debra Huntley, had to tell Ms.
> Hagen to stop.  Ms. Hagen also made comments
> to me about my formal tone orally and in
> written documents.  She made comments that
> this was "Caribbean culture" and instructed
> me to "Go back to the Caribbean."  On yet
> another occasion Ms. Hagen said, specifically
> referring to those with accents, that "These
> people come here and don't even know how to
> talk, she went on to comment on the h's and
> a's."  These comments were extremely
> humiliating and painful for me.  I
> consistently feared going to work and
> experiencing this attack on my cultural
> identity.

(Doc #33, pp. 12-13.)  This fails to show the severe or pervasive

conduct required to constitute a hostile work environment.

Moreover, the evidence shows that Ms. Hagen was the person who

interviewed Plaintiff and essentially "hired" her into the

Department, that Plaintiff's supervisor from April 2003 through

October 2003 was Colette Choute (an African-American), that

Plaintiff's supervisor from January 2004 to December 2004 was

June Hutchinson (an African-American of Caribbean background),

and that, throughout 2003 and 2004, the GAP Department had a

large number of African-American employees and was headed by an

African-American, Larry Minard.  (Doc #24, ¶¶11-12, Exh. 10,

Exh. 20, p. 3.)

   Plaintiff has failed to submit evidence that would enable

any rational jury to find HIP liable on the claim of a

discriminatorily hostile work environment.

<u>THE LEGAL FRAMEWORK FOR POINTS IV, V AND VI.</u>

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that an "adverse employment action" was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent.  See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097 (2000); *Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997).  Where a discrimination claim is based on indirect or circumstantial evidence rather than on "direct evidence," courts apply the "burden-shifting" formula enunciated by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11, 113 S.Ct. 2742 (1993).  In order to withstand a motion for summary judgment, the plaintiff must submit evidence that would make out a "prima facie case."  If so, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination or other "adverse employment action."  If the defendant does this, then the burden shifts back to the plaintiff to show that the evidence as a whole would justify a reasonable trier of fact in finding "that the defendant intentionally discriminated against the plaintiff."

-24-

*Morisseau v. DLA Piper*, 532 F.Supp.2d 595, 610 (S.D.N.Y. 2008) (citing cases).

The required elements for the "prima facie case" are different for a Title VII claim and for an ADA claim.  In the case at bar, it is very clear that Plaintiff has failed to make a prima facie case for her ADA claim.  Therefore, I will jump ahead to discuss Point V and then come back to Point IV.

> POINT V.  Plaintiff has not made a prima facie case for her ADA claim (failure to accommodate a disability).

The Americans with Disabilities Act ("ADA") provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. §12112(a).  Claims alleging disability discrimination in violation of the ADA are subject to the *McDonnell Douglas* burden-shifting analysis.  *McBride v. BIC Consumer Prod. Mfg. Co., Inc.*, 585 F.3d 92, 96 (2d Cir. 2009).  "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

Plaintiff alleges denial of a reasonable accommodation.  To establish a prima facie case, Plaintiff must show "(1) that [s]he is an individual who has a disability within the meaning of the [ADA], (2) that an employer covered by the statute had notice of h[er] disability, (3) that with reasonable accommodation, [s]he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations." *Stone v. City of Mount Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997) (citation omitted).

The employee must give the employer notice and time.  "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.  .... First, 'the plaintiff bears the burden of proving ... that an accommodation exists that permits her to perform the job's essential functions.'"  *Jackan v. New York State Dept. of Labor*, 205 F.3d 562, 566 (2d Cir. 2000).

Plaintiff alleges that she requested HIP to accommodate a disability on two occasions.  <u>First</u>.  Following a slip and fall on 4/13/04, she returned to work on 4/19/04 and presented a note requesting an accommodation of "no heavy lifting [or] long periods of sitting."  But the evidence shows that HIP granted that accommodation.  <u>Second</u>.  Following a leave of absence from 5/27/04 to 11/1/04 for mental stress, her doctor wrote "avoid

stressful situations and close or very tight work quarters."  But
the evidence shows that the doctor's note was not faxed to HIP
until 12/8/04, two days after plaintiff was fired.

    1.  <u>The time period from April 13 to May 27, 2004</u>

On April 13, 2004 (a Tuesday), plaintiff slipped and fell
in a Walgreens store on her lunch hour.  She went on leave for
the rest of the week.  She returned to work on Monday April 19
and presented a Disability Certificate on April 19 or 20.  A copy
of this Disability Certificate is at Doc #24, Exh. 11.  It is
dated 4/16/04 and is the size of a doctor's prescription pad.  It
is imprinted with "Downtown Physical Medicine & Rehabilitation,
P.C., 19 Beekman Street, New York, New York 10036."  It says that
Maureen Wright is "partially incapacitated from 4/16/04 to
4/30/04."  The remainder is a handwritten note saying:

> The above named patient is under my care.
> Patient is partially disabled and she can work
> light duty with no heavy lifting and [no] long
> periods of sitting.

The note does not describe the injury, but Plaintiff says she
had hurt her back and arm.  Also at Doc #24 is Exh. 12, an e-mail
exchange between Brenda Kane (a nurse at HIP's on-site wellness
center) and Allie Hagen.  On 4/20/04 at 4:29 PM Nurse Kane wrote:

> Subject: Maureen Wright
> Because of her recent accident her doctor
> has recommended avoiding long periods of sitting.
> I just spoke to her [Plaintiff] and she tells me
> that she spoke to you and that you are aware of
> her getting up from her chair when necessary.  This
> is helping her to recover.  Please respond to this

e-mail letting me know if you can or cannot accept
Ms. Wright's accommodation.

On 4/22/04 at 5:57 PM, Ms. Hagen responded (with a copy to Ms.
Hutchinson):  "This is not a problem."

HIP argues that plaintiff was accommodated because she was
allowed to stand and move around when she wanted to, and that her
job did not require her any heavy lifting.  Plaintiff admits that
HIP did not require her to do any heavy lifting or any long
periods of sitting without standing.  However, she complains that
Ms. Hutchinson forced her to return to work on April 19.
Plaintiff writes to me: "**Please note.  According to my doctor's
order, my sick leave was in effect until April 30, 2004.**"  (Doc
#34, p. 20, emphasis by Plaintiff.)  To put it mildly, Plaintiff
is mistaken.

Plaintiff also writes:

> Ms. Hutchinson claimed that my position did not
> require heavy lifting, whether with files or other
> materials.  This is a matter of playing with words.
> ....  The mere fact that the Dr. stated that I can
> do **light work with no heavy lifting** means that there
> should be no pressure on my arm.  ....

Doc #34, p. 27, emphasis by Plaintiff.)

There is no evidence that Plaintiff gave HIP notice of this
unusual interpretation of the doctor's note.  Nurse Kane's e-mail
certainly shows no such interpretation.  Plaintiff worked from
April 19 to 30, and then on May 3 she went home "on sick/Family
Medical [leave] for the rest of the week."  (Doc #34, p. 24.)

-28-

As far as I can see, there is no other evidence of any
notice to Ms. Hutchinson or higher managers concerning any
request for accommodation from April 13 to May 27, 2004.  As to
that time period, Plaintiff's evidence fails to establish a prima
facie case under the ADA.

2.  <u>The time period from November 1 to December 6, 2004</u>

Ms. Hutchinson's Declaration states:

> 11. .... [O]n May 27, 2004, .... [i]mmediately
> upon receiving the formal warning, Ms. Wright-Jackson
> went out on disability leave.  The [GAP] department
> was not informed of the details of her disability,
> either at time or later [until after her termination
> on 12/6/04].
>
> 12.  Ms. Hagen and I learned that Ms. Wright-
> Jackson was returning from leave, the Thursday or
> Friday before her Monday November 1, 2004 return.
> We did not receive notice of any accommodations
> Ms. Wright-Jackson may require after her November 1,
> 2004 return, either at that time, or later [until
> after her termination on 12/6/04].

(Doc #23, ¶¶11-12.)

The second time period covered the final five weeks of
Plaintiff's employment at HIP, November 1 to December 6, 2004.
As to this time period, Plaintiff alleges a different type of
disability, namely "mental stress / occupational depression."
(Complaint, p. 3.)

On December 8, 2004, two days after being fired, she filed
her administrative complaint with NYSDHR.  (Doc #24, Exh. 18.)
At ¶4, she wrote that in April 2004 "I presented medical
documentation that stated I could not do any heavy lifting or sit

-29-

for long periods of time." At ¶6, she wrote: "On May 27, 2004, .... I had a nervous breakdown and was out until November 1, 2004." Interestingly, however, her complaint to the NYSDHR did not assert that she had presented any request for accommodation as to her emotional condition.

Plaintiff's October 2009 Submission (Doc #33) asserts at page 14 (with my emphasis added):

> In a failure to accommodate case, the plaintiff must show that the employer should have reasonably accommodated the employee's disability and failed to. <u>HIP doctor[]s provided a required accommodation for me not to be subjected to stressful situations. HR and my supervisors were notified of this accommodation.</u> Despite this request, when I returned to work [Hutchinson?] and Hagen subjected me to increased stress and harassment and numerous adverse employment actions.
>
> <u>Ms. Hagen failed to reasonably accommodate my disability per HIP's own doctors' instructions.</u> .... During this period I began to feel the symptoms of anxiety and depression again. ....

The evidence fails to support the assertions I have underlined.

When Plaintiff talks about "HIP's own doctors," she is referring to the fact that she was treated by doctors and nurses who were part of the HIP healthcare network. Plaintiff's bound volume of Exhibits 1-57 includes a number of records from such doctors and nurses. But this is not proof of notice to HIP in HIP's role as her employer. Ms. McGuire's Reply Declaration makes that obvious point:

-30-

> 2.   Ms. Wright-Jackson incorrectly
> suggests that[,] as her employer, HIP had
> knowledge of her medical treatment, based on
> her seeking treatment from HIP medical
> facilities and providers.  It its role as
> employer, HIP did not maintain or have access
> to an employee's private medical records,
> even if the HIP employee used the HIP
> healthcare network.  An individual's
> healthcare records are private files relating
> to a doctor-patient relationship, and HIP, the
> employer, cannot access them, except with HIPAA
> waivers.

> 3.   Ms. Wright-Jackson also incorrectly
> suggests that HR had knowledge of treatment
> administered by the Employee Health
> Coordinators (nurses).  During the time of
> Ms. Wright-Jackson's employment, HIP
> employees could visit the Employee Heath
> Coordinators (such as nurse Brenda Kane)
> during the workday.  The Employee Health
> Coordinator maintained a file, which is a
> private medical record, and cannot be
> released to HR without a HIPAA medical
> authorization.  Thus, HR was unaware of the
> private medical information in the Employee
> Health Coordinator file.  In this litigation,
> after receiving Ms. Wright-Jackson's HIPAA
> authorizations, HIP requested the file so
> that it could produce it in discovery.

(Doc #31, ¶¶2-3.)

In Doc #35 at pages 21-22, Plaintiff makes the following

allegations (I add my comments in brackets):

> ....  Please note:  [On May 27, 2004,]
> I was triaged in the Nurses' station at
> 34th Street with Nurse Soroka on duty.  The
> same day I met with HR with Allyson in
> attendance of the meeting.  [Presumably this
> HR employee recorded the undisputed fact that
> Plaintiff's status was being changed to
> medical leave.]

> The mental health team contacted Nurse

-31-

who is a part of HR [there is no evidence to
support that any Nurse "is a part of HR."]
[T]he initial letter was faxed to HR.  Ex 40[.]
[In Pl. Exh. 40, p. 1, dated 5/27/04, Aquilla
Frederick, CSW, of Manhattan Mental Health
Service, 240 East 59th Street, wrote:  "To
Whom It May Concern: Ms. Maureen Wright-Jackson
was seen as an emergency case at this Mental
Health Center for acute stress associated with
occupational problems.  [She] is unable to
perform her job function at this time and it
is recommended that she be on medical leave
until June 11, 2004.  She will be reevaluated
at that time to assess her progress.  ...."]

                    *     *     *

     Nearing October 2004, ... I communicated
with nurse regarding my fear in returning to
the same traumatic department and [I] sought
verbal accommodation for a better working
environment and nurse advised me to write a
report to HIP and detail the incident.  Please
see Ex ?? [sic] letter to Ms Smith VP.
[Plaintiff is referring to the last part of
Pl. Exh. 40, which includes her 6-page memo to
Ms. Smith, VP of Human Resources, dated
September 16, 2004  and entitled "Constant
Harassment - - Allie Hagen - - GAP Dept."
See Doc #24, Exh. 13 and undisputed FACT 55.
In Pl. Exh. 40, Plaintiff now adds pages 8-20,
which allege that accommodation was requested
for the 4/13/04 slip and fall, but not for any
emotional disability.]

     On October 29, 2004 Allyson called me to
remind me of the procedure to do clearance
with nurse before I enter my department.  On
that occasion I verbally asked Allyson for
accommodation.

     On November 1, 2004, Dr. Sue [DeCotiis]
provided HIP with a Dr's Order that clearly
stated the type of environment I can
tolerate.  ....

(Doc. #35, pp. 21-22.)

                    -32-

However, Plaintiff is referring to a document signed by Dr. Sue G. DeCotiis on **December 8, 2004,** two days after Plaintiff was fired.  This document was produced in discovery as page 0000372 and was included in HIP's motion papers at Doc #24, Exh. 17.  It appears in Plaintiff's opposition papers as page 1 of Plaintiff's two-page Exhibit 36; page 2 of that exhibit is a facsimile transmittal from Brenda Kane RN to Dr. DeCotiis.  **I am annexing both exhibits at the end of today's Opinion and Order;** they show as follows.

On November 1, 2004, at 12:39 PM, Nurse Kane faxed to Dr. DeCotiis (a) a blank HIP form entitled "Clearance-Return to Work" and (b) a facsimile transmittal sheet that told Dr. DeCotiis:

> Ms. Maureen Wright-Jackson returned to work today.  Please complete the <u>Clearance Return to Work</u> for her and fax it back to me at 877 372 9818.  If you have any questions you can reach me at 646 447 5853.

Dr. DeCotiis received the blank form on November 1, 2004, but until December 8, 2004 she did not fill it out (or at least she did not fill out the part Plaintiff now relies on).  One part of the pre-printed HIP form said:  "Modified Duty / Special Accommodation: YES/NO."  Dr. DeCotiis circled the YES and then wrote:  "Avoid stressful situations and close or very tight work quarters as needed 2-3 mos."   She signed her name and wrote "12/8/04" on the line calling for the date.  She faxed the

completed form back to Nurse Kane on "12/08/2004 11:30" as shown
by the fax machine transmission line on the top of Doc #24, Exh.
17.  This is corroborated by the stamp near the bottom of page 2
of Pl. Exh. 36; the stamp was apparently affixed by Dr.
DeCotiis's office; the stamp consists of the word "FAXED" and a
rectangle, and inside the rectangle someone wrote "12/8/04."

     In desperation, Plaintiff asserts that the date on "the Dr's
order was switched to reflect an out of range date."  (Doc #34,
p. 46, retyped by HIP at Doc #32, p. 77.)  However, Plaintiff
does not support this assertion with any evidence from Dr.
DeCotiis or anyone else.

     The details are as follows.  HIP's FACT 59 stated:

          Upon her return to work on November 1,
          2004, and during the remainder of her
          employment [through December 6, 2004],
          Plaintiff did not present HIP with any
          accommodation requests.  McGuire Dec. at ¶14.

Plaintiff's Response to FACT 59 is at Doc #34, pp. 45-46.  She
makes the following arguments (I add my comments in brackets):

          a.  To refute this, please see Ex ?? [sic]
          Nurse's note confirming the completion of
          of my return to work documentations[.]
          [Plaintiff is referring to Pl. Exhs. 32 and 34
          which are duplicates of a single page of the
          Progress Notes of Nurse Brenda Kane.  The entry
          for 11/1/04 consists of four lines: "9AM.  MH.
          RTW today.  Affect good.  Appears willing to
          return to her department.  MD note in file."
          The "MD note" appears to refer to **Pl. Exh. 54,
          which I am annexing to today's Opinion.**  It is
          a one-page form signed by Dr. DeCotiis on
          10/7/04; ¶5 asked "Able to Return to Work On:"
          and the doctor filled in "11/01/04."  ¶5 also

-34-

had a line for "Remarks," but Dr. DeCotiis left
the line blank.  Pl. Exh. 54 contains no request
for any accommodation.]

                    *     *     *
      d.  Around lunch break, nurse physically
brought up copies of the doctor[']s order to
Ms. Hagen and other department heads.  Nurse
then came over to me at Priscilla's desk with
a copy of the doctor's order. .... [Plaintiff
submits no evidence of any doctor's "order"
or request for accommodation bearing any date
after May 27, 2004 or before December 8, 2004
- - no copy from her voluminous records,
and no copy from her doctor, and no evidence
from Nurse Kane.]

Moreover, it is very telling that the last documents annexed

to the Complaint are 40 pages of e-mails from 11/4/04 to 12/2/04

from Plaintiff to Ms. Hutchinson and Ms. Hagen, and vice versa

- - and that none of those e-mails mentions any disability or any

request for accommodation.

In sum, with respect to the period from November 1, 2004

through December 6, 2004, Plaintiff has failed to establish that

she gave her employer the required notice, namely a request for

an accommodation to her alleged mental and emotional disability.

This means that she has failed to establish a prima facie case of

disability discrimination.

It is unnecessary to consider whether Plaintiff's evidence

is sufficient to establish the other elements of a prima facie

case, for example, whether she had a disability within the strict

meaning of the ADA, or whether Dr. DeCotiis's belated handwritten

note to "avoid stressful situations" was a request for a

-35-

"reasonable" accommodation.  I now jump back to Point IV.

POINT IV.  Plaintiff's evidence barely makes out
a prima facie case on her Title VII claim.

To establish a prima facie case under Title VII,

plaintiff first must adduce evidence that would
permit a reasonable trier of fact to find that
(1) she was a member of a protected class, (2) her
job performance was satisfactory, (3) an adverse
employment action occurred, and (4) the action
occurred in circumstances giving rise to an
inference of discrimination.

*Morisseau v. DLA Piper*, 532 F.Supp.2d 595, 610 (S.D.N.Y. 2008)

(Kaplan, J.) (citations omitted).  In *St. Mary's*, the Supreme

Court characterized the plaintiff's initial burden (the four

elements of a prima facie case) as "minimal."  123 S.Ct. at 2746-

47.  Nonetheless, a plaintiff must proffer some admissible

evidence of circumstances that would be sufficient to permit an

inference of discriminatory motive.  *Chambers v. TRM Copy Centers

Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994).

The decision to impose the Final Warning and the decision to

fire Plaintiff were both made by the same three persons:  by her

supervisor Ms. Hutchinson, and by Ms. Hutchinson's superior Ms.

Hagen, and by the head of the GAP Department Mr. Minard.

Plaintiff does not claim that Ms. Hutchinson or Mr. Minard were

motivated to discriminate against her race, color, or national

origin.  She does make this claim against Ms. Hagen.  Her

Complaint alleged that Ms. Hagen made a single remark about her

Caribbean accent; her deposition alleged that Ms. Hagen also made

-36-

a comment about her Caribbean style; in opposing summary judgment she now alleges:  "Ms. Hagen also made comments to me about my formal tone orally and in written documents.  She made comments that this was 'Caribbean culture' and instructed me to 'Go back to the Caribbean.'  On yet another occasion Ms. Hagen said, specifically referring to those with accents, that 'These people come here and don't even know how to talk, she went on to comment on the h's and a's.'" (Doc #33, p. 13.)

These allegations are very thin.  However, viewing them in the context of all the evidence, including the pre-2/12/04 background evidence, I conclude that Plaintiff's evidence does barely make out a prima facie case on her Title VII claim.  I now jump ahead to HIP's Point VI.

<u>POINT VI.  HIP has shown a legitimate reason for plaintiff's Formal Warning and termination, and Plaintiff has failed to show that the reason was a pretext for discrimination.</u>

Plaintiff has failed to make a prima facie case on her ADA claim, but has made a prima facie case on her Title VII claim. Therefore, as to the Title VII claim, "the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the termination." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006).  The employer's burden is simply "one of production, not persuasion." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2106 (2000).

HIP has met that burden through Ms. Hutchinson's Declaration (Doc #23), particularly ¶¶7-9, 11, and 14-15.

Therefore, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006).  To demonstrate pretext and avoid summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision," but she is required to show "that they were not the only reasons and that the prohibited factor was at least one of the motivating factors."  *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks omitted).

"Merely disagreeing with a supervisor's assessment of work performance, however, 'is insufficient to raise a triable issue of fact regarding pretext.'"  *Iverson v. Verizon Communications*, 2009 WL 3334796, *5 (S.D.N.Y. Oct. 13, 2009) (Scheindlin, J., citing cases).  In the case at bar, Plaintiff submits Doc #36, eleven single-spaced pages entitled "Plaintiff's Response to June Hutchinson's Declaration."  It fails to show that HIP's stated reasons were not the only reasons for her termination; it also fails to show that her race, color, or national origin were a motivating factor in her termination.

-38-

Plaintiff does not dispute that from April 1, 2003 through October 31, 2003, she was supervised by Ms. Choute (an African-American) and her superior Ms. Hagen (a Caucasian). (Doc #32, p. 28.) Plaintiff does not dispute that from January 5, 2004 through December 6, 2004, she was supervised by Ms. Hutchinson and her superior Ms. Hagen. Of those three key women, Plaintiff alleges that only one was motivated by any intent to discriminate against Plaintiff's race, color, or national origin, namely Ms. Hagen; to support this allegation, Plaintiff does not submit any evidence beyond what was discussed in Point IV above.

Ms. Hutchinson states: "Both Ms. Wright-Jackson and I are African-American females of Caribbean/Jamaican background." (Doc #23, ¶3.) Plaintiff responds: "Also Ms. Hutchinson chose to highlight that we basically share the same gender, ethnicity, and culture. I do not agree with this argument, for anyone can claim that they are from any country of their choice, until it is proven. .... Even if HIP hires a thousand Jamaican female[s], that does not relieve them from the facts of my case." (Doc #36, p. 1.)

Ms. Hutchinson states: "At the beginning of 2004, when I became Ms. Wright-Jackson's supervisor, Ms. Hagen and I met with Ms. Wright-Jackson to discuss her December 2003 evaluation [Doc #28, Exh. 8, signed by Ms. Choute]. We told her that she needed to work independently, and complete projects accurately. ...."

(Doc #23, ¶7.)  Plaintiff responds: "Ms. Hutchinson['s] period
started January 5, 2004, which does not give her the right to
participate in my evaluation that I received in December.  ....
I should be [should have been] started with a clean slate.  There
should be no mental model set forth as the building block of my
performance.  So this in itself is wrong and unfair to the
worker."  (Doc #36, p. 3.)

Ms. Hutchinson states:  "In early 2004, I sat down with Ms.
Wright Jackson individually, on multiple occasions, to explain
the errors in her work, and give her detailed instructions on how
to correct the errors (which she would not write down and also
did not appear to follow)."  (Doc #23, ¶8.)  Plaintiff responds:
"... I don't feel that I was exempt from making an error here or
there for[,] like I said before[,] I am a human.  What does not
sit well with me is the ploy behind the error findings to find
something to terminate me as it is clear that they were setting
me up for termination."  (Doc #36, pp. 6-7.)

At pages 6-9 of today's Opinion (the last part of the
section titled "Factual and Procedural Background"), I discussed
HIP's extensive documentation of the reasons for the Formal
Warning and the termination, and I quoted all of ¶14 of Ms.
Hutchinson's Declaration.  That ¶14 began:  "When Ms. Wright-
Jackson returned to work [after her disability leave from 5/27/04
to 11/1/04] Ms. Hagen and I did everything we could to ease her

back into her work responsibilities."  Plaintiff responds:

> How Ms. Hutchinson could claimed that she
> did everything possible to ease me back into the
> department.  This is blatantly untruthful[; I say:]
> . HIP deprive me of my equipped office
> . HIP deprive me of other necessary resources
> . Set up unattainable goal and were not willing
>    to revisit.
> . Set overload schedule and was not willing
>    to reprioritize.
> . They gave new tasks with insufficient
>    instructions and were not willing to
>    address despite the many appeals for
>    revisit.

(Doc #36, p. 11.)

Plaintiff does not dispute that she received each of the communications regarding her performance deficiencies.  She does not dispute that she missed deadlines.  Her excuse is that the deadlines were "unrealistic" and that the tasks were "overwhelming," at least in view of her depression.  (Doc #34, p. 49.)  But this excuse is not supported by the extensive e-mails annexed at the end of her Complaint.

I have reviewed the evidence submitted by Plaintiff.  It fails to show that HIP's stated reasons were not the only reasons for her termination; it also fails to show that her race, color, or national origin were a motivating factor in her termination. No reasonable jury could find in Plaintiff's favor on her Title VII claim of discrimination.

> POINT VII.  Plaintiff's evidence fails to make out a
> prima facie case on her retaliation claim.

Plaintiff claims that, within the 300-day period commencing

-41-

February 12, 2004, HIP violated 42 U.S.C. §2000e-3(a) and §12203(a), by taking adverse actions against her in retaliation for her complaints that she had been discriminated against because of race, color, national origin, and/or disability.

The Second Circuit has written:

> In order to present a prima facie case of retaliation under Title VII or the ADEA [or the ADA], a plaintiff must adduce
>
>> evidence sufficient to permit a rational trier of fact to find [1] that [s]he engaged in protected participation or opposition under Title VII [or the ADA], [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e. that a retaliatory motive played a part in the adverse employment action.

*Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 205-06 (2d Cir. 2006) (citations omitted).

After reviewing Plaintiff's evidence, I find that no rational trier of fact could find the fourth essential element, namely, a causal connection.

Prior to April 2003, Plaintiff made complaints about John Kennedy and Robert Cronin. She made a formal written complaint about them in a one-page memorandum dated January 13, 2002 to Terrylynn Smith, vice president of Human Resources ("HR"). (Doc #24, Exh. 4.) It did not refer to race, color, national origin, or disability, but it did allege "constant harassment,

discrimination, humiliation and unfair treatment."  It also said:
"With your assistance, I am therefore seeking a way out of this
department at the earliest chance."  Diane McGuire of HR met with
Plaintiff and eventually sent her a one-page response dated March
7, 2002.  (Doc #24, Exh. 5.)  Plaintiff continued to have
conflicts in the Medicare Marketing Department, and in February
2003 she met with Ms. McGuire and again requested a transfer.
After that meeting, and after an application process and an
interview with Ms. Hagen, Plaintiff was transferred to the GAP
Department.  (Doc #24, ¶10.)

     No rational jury could find a causal connection between
Plaintiff's complaints about Mr. Kennedy, Mr. Cronin, and their
Medicare Marketing Department, which she left in March 2003, and
any adverse actions that occurred more than ten months later, on
or after the key date of February 12, 2004.

     A crucial adverse action occurred on May 27, 2004.  FACT 46
(undisputed, see Doc #32, p. 52) states:

               In late April and May 2004, Hutchinson,
          Hagen and Minard contacted HR about
          Plaintiff's inability to improve her
          performance and requested to start the
          termination process.

Throughout 2004, Ms. McGuire was Assistant Director of Employee
Relations in the HR Department; her Declaration states:  "In May
of 2004, Ms. Hagen and Ms. Hutchinson consulted with me about
terminating Mr. Wright-Jackson's employment because of work

performance deficiencies.  We agreed that the GAP Department
would generate a written, formal warning, creating a probationary
period and requiring immediate improvement."  (Doc #24, ¶15.)
Ms. Hutchinson's Declaration, at ¶11, states:  "We issued a
formal warning on May 27, 2004, a true and correct copy of which
is attached as Exhibit 2."  (Doc #23, ¶11.)  The Formal Warning
(Doc #23, Exh. 2) told Plaintiff, among other things: "Enrollment
Statistics Report ... You must fully document the process and
submit both a hard copy and electronic copy to Ms. Hutchinson no
later than May 28th, 2004.  ....  Failure to immediately correct
your unsatisfactory work performance and sustain that correction
will result in further disciplinary action, up to and including
termination of your employment."  (Doc #23, Exh. 2, pp. 1,2,3.)

    Plaintiff did not meet the deadline of May 28, 2004.  She
received this Formal Warning on May 27 and she went out on leave
from May 27, 2004 until November 1, 2004.  (Doc #32, pp. 68-70;
Doc #34, p. 42-43.)

    On September 16, 2004 (during her 5/17/04 to 11/1/04 leave)
Plaintiff wrote another formal complaint to Ms. Smith in HR.
This is a six-page memorandum with the subject line "Constant
Harassment - - Allie Hagen - - GAP Dept."  (Doc #24, Exh. 13; see
also FACT 55, undisputed, Doc #32, p. 72.)  At pages 3-5,
Plaintiff wrote ten "bullet points."  Seven of the ten bullet
points gave details that did not involve race, color, national

origin, or disability, even though five of those bullet points
began with the word "Bias."  On the other hand, the sixth bullet
point said:

> Offensive Comment about my Accent and Cultural Differences
>     Ms. Hagen insultingly made derisive statements
>     about my accent in [a] public forum.

And the ninth bullet point said:

> Unnecessary pressure during partial disability
> (slip and fall accident)
>     These pressures were instilled by June Hutchinson
>     with the instructions of Ms. Hagen.  [Plaintiff
>     then listed five examples, but did not mention
>     any request for accommodation.]

The tenth bullet point was the longest; it complained about the
"Brutal undeserved formal reprimand" of 5/27/04 and said:  "Ms.
Hagen['s] statements surround[] the period I was partially
disabled and was unable to comply with the extra tasks ...."
(Doc #24, Exh. 13, p. 5.)

In sum, Plaintiff's 9/16/04 Memorandum did contain a few
references to her accent and her disability.  I find this
evidence sufficient to permit a rational jury to find (1) that on
9/16/04 she engaged in protected opposition under Title VII and
the ADA, and (2) that the employer was aware of this activity.
But this belated complaint about Ms. Hagen came almost four
months after the 5/27/04 Formal Warning, which placed Plaintiff
on probation and warned her:  "Failure to immediately correct
your unsatisfactory work performance and sustain that correction
will result in further disciplinary action, up to and including

termination of your employment."  (Doc #23, Exh. 2, p. 3.)

On October 7, 2004, Plaintiff's doctor sent Human Resources a form saying that Plaintiff was able to return to work on November 1, 2004.  (Pl. Exh. 54.)  FACT 53 (undisputed): "Because Plaintiff had received the May 27, 2004 formal warning, she was on probation when she returned November 1, 2004."  (Doc #32, pp. 70-71.)  FACT 48:  "HIP's general practice was to provide an employee with a two-week period to demonstrate improved performance after a formal warning; uncorrected performance would result in termination of employment.  McGuire Dec. at ¶18."  Plaintiff's response fails to controvert the Declaration of Ms. McGuire of Human Resources; Plaintiff merely says:  "This statement was just word of mouth by Ms. McGuire.  I have no proof to it.  And even if this was true, it was not done in good faith. ...."  (Doc #32, p. 53.)  The two-week period had been noted in the 12/6/04 termination memo to Plaintiff.  (Doc #24, Exh. 16, p. 1.)

The McGuire Declaration at ¶18 also stated that, during the two-week period beginning on November 1, 2004, "Ms. Hagen and Ms. Hutchinson thus monitored her performance, which HR learned did not improve.  I, along with Mr. Minard, Ms. Hagen and Ms. Hutchinson, decided to complete the termination process begun in May 2004 ...."  Their decision flowed naturally from the decision made in May 2004 by these same three persons and

approved by Ms. McGuire and Ms. Smith.  (See undisputed FACT 46, quoted at page 43 of today's Opinion.)

Plaintiff does not dispute that Ms. Hutchinson and Ms. Hagen made the same types of criticisms of her performance in November that they had previously made from January to May.  She does not allege that her performance was better in November; indeed, it seems clear that she is saying that in November she was suffering from depression which, relatively speaking, had been in remission during the period from February 12, 2004 until May 27, 2004.

On November 24, 2004, at 11:57 AM, Plaintiff sent an e-mail to Ms. Smith and said, in part:  "This is my third week back ....  While I was out sick I wrote to you [on 9/16/04, Doc #24, Exh. 13] ....  I read your reply [dated 10/29/04, Doc #24, Exh. 14] ....  I still believe that you are fair and capable of revist[ing] this case ....  I am also willing to give up my legal rights and sign off to assure you that I will exclude litigation. ....  I have to go back to see my doctor and therapist.  If this continues I will be put out again."  (Doc #24, Exh. 15.)  A few hours later, Nurse Kane wrote: "11/24/04 2:20 pm [Plaintiff] Arrived at EHS crying.  Perceived unfairness in her department. Unable to cope. .... Appt. [with] Dr. DeCotiis 1:15 pm Mon. 11/29/04.  Advised appt. [with] MH['s] professional Dr. Frederick ASAP.  Sent home 3 pm."  (Pl. Exh. 32.)

Concerning Plaintiff's 11/24/04 e-mail to Ms. Smith, Ms.

McGuire's Declaration, at ¶19, states:  "... HIP had already decided to terminate Ms. Wright-Jackson, [but] we [at HR] investigated her allegations again.  We met with Mr. Minard, Ms. Hagen, and Ms. Hutchinson, as well as with Ms. Wright-Jackson, and found the allegations unsubstantiated."  Plaintiff confirms that on 12/1/04 "I attended a 2pm meeting with HR VP Ms. Smith and Asst. Director Ms. Diane McGuire.  The meeting lasted for 2 hours."  (Pl. Exh. 57, p. 16.)  The formal termination memo was handed to Plaintiff on Monday, December 6, 2004.  (Doc #24, Exh. 16.)

Plaintiff has never alleged that Ms. Smith, or Ms. McGuire, or Mr. Minard, or Ms. Hutchinson was motivated by any intent to discriminate against Plaintiff's race, color, national origin, or perceived disability.  Plaintiff has alleged, albeit on thin evidence, that Ms. Hagen was motivated to discriminate against Plaintiff's national origin.  No rational jury could conclude that HIP's 12/6/04 action, in which five persons followed through on their May 2004 decision to "start the termination process" (undisputed FACT 46), was motivated in part by a desire to retaliate against Plaintiff for writing her 9/16/04 memorandum and asking Ms. Smith to investigate Ms. Hagen for "harassment."  Ms. Smith responded by conducting an investigation (see Doc #24, Exh. 14) and then HIP gave Plaintiff a second chance to improve her performance.

Accordingly, Plaintiff's evidence fails to make out a prima facie case on her retaliation claim.

### CONCLUSION

For the reasons stated above, I hereby grant Defendant HIP's motion for summary judgment (Doc #21).  I direct the Clerk of the Court to enter judgment dismissing the Complaint in its entirety.

_Douglas F. Eaton_
DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, NY 10007

Dated: New York, New York
       February 19, 2010

Annexed to this Opinion and Order are copies of:
    Pl. Exh. 54: a one-page form signed by Dr. DeCotiis
         on 10/7/04, stating that Plaintiff would be
         Able to Return to Work on 11/1/04.  (See today's
         Opinion at page 34.)
    Pl. Exh. 36, p. 2: a facsimile transmittal faxed from
         Brenda Kane RN to Dr. DeCotiis on 11/1/04, and
         faxed back to Brenda Kane RN on 12/8/04.  (See
         today's Opinion at pages 32-33.)
    Pl. Exh. 36, p. 1: a form signed by Dr. DeCotiis
         on 12/8/04.  (See today's Opinion at pages 32-33.)
    Doc #24, Exh. 17: the same form, with two lines at the
         top showing a fax transmission on 12/08/04 after
         a fax transmission on 11/1/04.  (See today's
         Opinion at pages 32-33.)

Copies of this Opinion and Order are being mailed on February 19, 2010 to:

Ms. Maureen Wright-Jackson     Seema A. Misra, Esq.
593 Liberty Street             Stroock & Stroock & Lavan LLP
Uniondale, NY 11553            180 Maiden Lane
                               New York, NY 10038-4982

-49-

9/27/04
PRTW: 0/00/00

HIGHMARK LIFE INSURANCE CO. OF
NEW YORK - CLAIMS OFFICE
500 HELENDALE ROAD SUITE 260
ROCHESTER            NY   14609
FAX: 585-482-5132            Phone: 800-421-3711

## DISABILITY BENEFITS SUPPLEMENTARY FORM

**IMPORTANT**   *NO FURTHER BENEFITS WILL BE PAID UNTIL THIS FORM IS COMPLETED BY YOUR HEALTH CARE PROVIDER.*

**FORM DUE**        10/11/04            PAID THROUGH: 07/30/2004
PLEASE RETURN THIS FORM AS CLOSE TO ABOVE DATE AS POSSIBLE
MAUREEN R WRIGHT-JACKSON        SS#:
                                          Claim #:        C0000001517
221 BEACH 19TH ST
FAR ROCKAWAY    NY   11691        Policy #:    14029-03

55
56
57

---

**CLAIMANT**

Have you returned to work? ☐ Yes        Date Returned:        ____/____/____

☑ No        Date you Expect to:    ____/____/____

Date of Last Exam: 10 / 7 / 04        Date of Next Exam:    ____/____/____

**HEALTH CARE PROVIDER**

1. Give Current Diagnosis: _Anxety, Depression, Fatigue_

When do you expect a fundamental or marked change in the patient's condition?
☐ Never    ☐ Expected to Regress    ☑ Expected to Improve

2. Give All Dates Treated Since __06__/__04__/_2004_  Office: _12_/_7_/_04_  Hospital: ____/____/____
Have any surgical procedures been performed or recommended since your last report?   ☐ Yes   ☑ No

Date Admitted: ____/____/____   N/A        Date Discharged: ____/____/____

Name of Hospital:_____        Reason:_____

3. Planned Course of Treatment: _Cymbalta 60,_

Medications Prescribed: _as above_        * DR.: WE MUST HAVE ALL DATES
                                          OF TREATMENT SINCE _____ *
4. How long was or will this claimant be continuously disabled for this condition?

From Date: _6_/_7_/_04_   To Date: _11_/_1_/_04_

*PLEASE DO NOT USE: "PRESENT", "UNKNOWN", OR "UNDETERMINED"*

5. Able to Return to Work On: _11_/_21_/_04_   Remarks:_____

6. _[signature]_    M.D.
HEALTH CARE PROVIDER'S SIGNATURE

7. Address: _44 E 93' St   #6S0_
_NY NY  13016_

Phone No.: _212 685 7643_   Date: _10_/_07_/_04_

SUE G. DeCOTIIS, M.D.
INTERNAL MEDICINE
24 EAST 36TH STREET, SUITE 1C
NEW YORK, NY 10016
212-685-3640

** THIS FORM MUST BE **
** RETURNED BY THE ABOVE **
** DATE TO AVOID **
** INTERRUPTION OF BENEFITS. **

NANCY        9959
DBL420 8/95

Pl. Exh. 54

NOV-01-2004 MON 12:39 PM

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | Dr. Decotiis | Fax: | $12$ $779$ $4782$ |
| From: | Brenda Kane RN | Date: | 11/01/2004 |
| Re: | Maureen Wright-Jackson | Pages: | 1 |
| CC: | | | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Ms. Maureen Wright-Jackson returned to work today. Please complete the

Clearance Return to Work for her and fax it back to me at 877 372 9818. If you

have any questions you can reach me at 646 447 5853.

FAXED   *Pl. Exh. 36, p. 2*



# HIP HEALTH PLAN OF NEW YORK
## CLEARANCE-RETURN TO WORK
This form must be returned at least two (2) business days before return to work

Name: _Master Wejust Tachi_     Facility _____

Position: _____     Department: _____

Date Leave Started: _____     Return-to-Work Date: _____

Reason for Leave: (i.e., Medical, Personal, Work-Related Injury, etc.) _Medical_

Modified Duty/Special Accommodation: YES/NO  Restrictions: _____
_avoid driving/operation 1_
_and close or any of heavy equip_

Estimated Length of Restrictions (How Long?): _____
_for next 2-3 mo._

**Physician Certification of ability to return to work:**
(This must be the same attending Physician as during your Leave of Absence)

Physician's Signature _J G Celli_

Physician's Name _J G DeCutis MD_  Date: _12/8/07_

## Occupational Health

Restrictions Can Be Accommodated: _____  Restrictions *Can Not* Be Accommodated: _____

Signature: _____

Comments: _____

FOR LEAVE OF ABSENCE GREATER THAN TWELVE (12) WEEKS SEE YOUR HUMAN RESOURCES
MANAGER BEFORE YOU RETURN TO WORK!!!

Signatures:

Employee: _____

Benefits Representative: _____

CC:     Employee's Health folder
        Department Manager

NOTE:     If your leave is for medical reasons, *clearance* from your doctor must be attached to this form

_Pl. Exh. 36, p. 1_

12/08/2004  11:30    222
NOV-01-2004 MON 12:38 PM                        FAX NO.                    PAGE  01
                                                                          P. 02

**HIP**

RECYCLED
80000 SERIES
30% P.C.W

---

## HIP HEALTH PLAN OF NEW YORK
## CLEARANCE-RETURN TO WORK

This form must be returned at least two (2) business days before return to work

Name: Maurez Wright Jackn          Facility _____

Position: _____           Department: _____

Date Leave Started: _____   Return-to-Work Date: _____

Reason for Leave: (i.e., Medical, Personal, Work-Related Injury, etc.)  Medical

Modified Duty/Special Accommodation:  YES/NO  Restrictions: _____
                                       Avoid stress/(situation)
                                       and cloro or very hight work quarter
Estimated Length of Restrictions (How Long?): As needed. 2-3 mos.

**Physician Certification of ability to return to work:**
(This must be the same attending Physician as during your Leave of Absence)

Physician's Signature  J.G Dell ^

Physician's Name  Jn G DeGatij MD  Date: 12/8/07

---

## Occupational Health

Restrictions Can Be Accommodated: ____  Restrictions *Can Not* Be Accommodated: ____

Signature: _____

Comments: _____

---

FOR LEAVE OF ABSENCE GREATER THAN TWELVE (12) WEEKS SEE YOUR HUMAN RESOURCES MANAGER BEFORE YOU RETURN TO WORK!!!

Signatures:

Employee: _____

Benefits Representative: _____

CC:    Employee's Health folder
       Department Manager

**NOTE:**    If your leave is for medical reasons, clearance from your doctor must be attached to this form

---

Doc #24, Exh. 17